Argued 19 October, decided 28 November, 1904.

**MACBETH v. BANFIELD.**

[78 Pac. 693.]

</div>

LIABILITY OF SUBSCRIBERS FOR UNPAID STOCK SUBSCRIPTIONS.

1. Under Const. Or. Art. XI, § 3, making stockholders liable for the debts of a corporation to the amount of their stock subscribed and unpaid, and B. & C. Comp. § 5065, providing that all sales of stock shall subject the purchaser to the payment of any balance due on the stock, a stockholder in an insolvent corporation is liable for the debts of the corporation to the extent of the unpaid part of his subscription, his liability being an asset of the corporation which may be reached by a suit in equity.

RIGHT TO PAY STOCK SUBSCRIPTION WITH PROPERTY.

2. In the absence of a constitutional or statutory inhibition, the directors of a corporation may receive property in payment for stock in any case in which they are authorized under the articles of the corporation to purchase for the benefit of the corporation ; but where they do so the property received must be equal in worth to the par value of the stock thus paid for.

DOCTRINE OF TRUST FUND AS TO UNPAID STOCK SUBSCRIPTIONS.

3. While it is a going concern a corporation may dispose of its assets, including the sums received on stock subscriptions, the corporate charter permitting, and no trust arises with reference thereto ; but when insolvency occurs all assets, including unpaid subscriptions, become trust funds for the benefit of creditors.

CORPORATIONS — FRAUD IN PAYING STOCK SUBSCRIPTIONS WITH OVER-VALUED PROPERTY — SUIT BY CREDITORS.

4. A payment of stock subscriptions with property may be attacked by creditors for either actual or legal fraud — the result is the same in both cases, the manner of proof, only, being different.

ELEMENTS IN DETERMINING GOOD FAITH OF DIRECTORS WHO ACCEPT PROPERTY IN PAYMENT FOR STOCK SUBSCRIPTIONS

5. In determining whether the directors of a corporation were guilty of fraud in taking property in exchange for stock, it is competent to consider the nature of the property, the purposes for which it was accepted, and all the circumstances attending the transaction ; and, if it appears that they have acted in good faith, and that an overvaluation may have been due to an honest error of judgment, their acts are conclusive.

LIABILITY OF STOCKHOLDERS FOR DIFFERENCE BETWEEN SUBSCRIPTION
AND AMOUNT PAID BY OVERVALUED PROPERTY.

6. Where stock is issued by directors for property taken at an overvaluation, it is competent, at the instance of creditors, to compel the stockholders to respond with money for the difference between the actual value of such property and the par value of the stock.

From Multnomah : ALFRED F. SEARS, JR., Judge.

Statement by MR. JUSTICE WOLVERTON.

This is a suit by William Macbeth, trustee of the Kaupisch Creamery Company, a corporation, bankrupt, against M. C. Banfield and others. Prior to January 27, 1899, Julius C. Kaupisch and H. W. Kaupisch were engaged in the creamery business under the firm name of the Kaupisch Creamery. On that date they transferred and set over to M. C. Banfield and Thomas Rand an undivided one half interest in the business, for the stipulated consideration of $5,000. One thousand dollars of this amount was at once applied on invoices for butter previously shipped to the firm from the East. On the following day a corporation was organized as the Kaupisch Creamery Company, with a capital stock of $30,000, divided into 1,200 shares, at $25 each, to which corporation the Kaupisch Creamery, the partnership concern, transferred by bill of sale all of its plant, stock, machinery, good will, etc., for the designated sum of $16,000,

NOTE.—See extensive note in 63 L. R. A. 673–706, Equitable Remedy to Subject Choses in Action to Judgment After Return of no Property Found, and note in 3 Am. St. Rep. 810–814, Equitable Jurisdiction to Compel Payment of Unpaid Subscriptions.

See 42 L. R. A. 593–635, for a collection of English and American authorities under the heading, How Far the Payment for Stock in a Corporation by a Transfer of Property Will Protect the Shareholder Against Creditors of the Company. Read also note in 64 Am. St. Rep. 34, on Exchanging Property for Stock in Corporations.

In 3 Am. St. Rep. 817–821, is a note on How Payments for Shares May be Made.

Also read Powers of Assignees for Benefit of Creditors, of Assignees in Bankruptcy, and of Receivers, With Respect to Unpaid Subscriptions, 3 Am. St. Rep. 833.

Further, see Nature of Statutory Liability of Stockholders for Corporate Debts, 3 Am. St. Rep 846–854.

And, see note, How Statutory Liability of Stockholders for Corporate Debts is Enforced, 3 Am. St. Rep. 854–857.          REPORTER.

and also paid into its treasury $4,000 in cash, all in consideration that the board of directors of the Kaupisch Creamery Company should issue 800 shares of its capital stock, fully paid up, as follows: To Julius C. Kaupisch, 4 shares; H. W. Kaupisch, 196 shares; H. M. Kaupisch, 4 shares; M. M. Kaupisch, 196 shares; M. C. Banfield, 200 shares; and Thomas Rand, 200 shares — who were subscribers therefor. This was agreed to by unanimous vote of the board, and the stock was subsequently issued accordingly, and accepted by the parties named, thus closing the transaction. But two additional shares were subscribed for, which were fully paid up. The corporation, after engaging in business for six months or thereabouts, became insolvent; and the plaintiff was appointed trustee in bankruptcy, and now brings this suit for the benefit of the creditors, to require the above stockholders to respond for any balance of their stock that might be deemed unpaid, to the amount of the unpaid indebtedness of the concern. The plaintiff prevailed in the trial court, and this appeal is by Banfield alone.                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. William Torbert Muir*, to this effect.

I. The Constitution of Oregon creates no right. The liability is under the stock subscription and is for the indebtedness, not to the creditor: *Brundage* v. *Monumental Min. Co.* 12 Or. 322, 324, 325 (7 Pac. 314); *Patterson* v. *Lynde*, 106 U. S. 519–521 (1 Sup. Ct. 432).

II. The rule governing the liability of stockholders under stock subscriptions claimed to have been paid in property is based on fraud and not the trust fund theory: *Hospes* v. *Northwestern Car Co.* 48 Minn. 174 (15 L. R. A. 470, 31 Am. St. Rep. 637, 50 N. W. 1117–1119); *Graham* v. *Railway Co.* 102 U. S. 148; *Fogg* v. *Blair*, 133 U. S. 534–541 (10 Sup. Ct. 338); Clark, Corp. 539, 540–542.

III. Subscribers to the capital stock of a corporation who pay their subscription in property are not liable to the corporation in a creditors' suit as upon an unpaid stock subscription, unless the transaction by which the property is conveyed is tainted with fraud. Fraud must be alleged and proved: *Schenk* v. *Andrews*, 57 N. Y. 133; *Boynton* v. *Andrews*, 63 N. Y. 93; *Lake Superior Iron Co.* v. *Drexel*, 90 N. Y. 87; *Gamble* v. *Queens County Water Co.* 123 N. Y. 191 (9 L. R. A. 527, 25 N. E. 201); *Hospes* v. *Northwestern Car Co.* 48 Minn. 174 (31 Am. St. Rep. 637, 15 L. R. A. 470, 50 N. W. 117); *Brant* v. *Ehlen*, 59 Md. 1, 29; *DuPont* v. *Tilden*, 42 Fed. 87; *Phelan* v. *Hazard*, 3 Dill. 45 (Fed. Cas. 11068); *Steacy* v. *Little, etc. Co.* 5 Dill. 348; *Northwestern M. Ins. Co.* v. *Cotton Exch. Co.* 70 Fed. 155; *Young* v. *Erie Iron Co.* 65 Mich. 111, 121 (31 N. W. 814); *Coit* v. *North Carolina G. Amalg. Co.* 119 U. S. 343–345 (7 Sup. Ct. 231); *Bank of Fort Madison* v. *Alden*, 129 U. S. 372 (9 Sup. Ct. 332); *Fogg* v. *Blair*, 139 U. S. 118 (11 Sup. Ct. 476); *Peck* v. *Campbell*, 11 Ill. App. 88; *Streator* v. *Rankin*, 45 Ill. App. 226; *Coffin* v. *Ramsdell*, 110 Ind. 417 (11 N. E. 20); *Bruner* v. *Brown*, 139 Ind. 600, 605 (38 N. E. 318); *New Haven H. Nail Co.* v. *Linden Springs Co.* 142 Mass. 349, 355 (7 N. E. 773); *Turner* v. *Bailey*, 12 Wash. 634 (42 Pac. 115); *Kroenert* v. *Johnston*, 19 Wash. 96 (52 Pac. 605); *Savage* v. *Ball*, 17 N. J. Eq. 142; *Bickley* v. *Schlag*, 46 N. J. Eq. 533 (20 Atl. 250); *Carr* v. *LeFevre*, 27 Pa. St. 413; *American Tube Co.* v. *Hayes*, 165 Pa. St. 489 (30 Atl. 936); *Woolfolk* v. *January*, 131 Mo. 620–630 (33 S. W. 432); *Kelly* v. *Fleteher*, 94 Tenn. 1 (28 S. W. 1099); *Jones* v. *Whitworth*, 94 Tenn. 602 (30 S. W. 736); *National Bank* v. *Illinois & W. Lum. Co.* 101 Wis. 247, 254 (77 N. W. 185); *Whitehill* v. *Jacobs*, 75 Wis. 474, 481 (44 N. W. 630); *Elyton Land Co.* v. *Birmingham W. & E. Co.* 92 Ala. 407 (12 L. R. A. 307, 25 Am. St. Rep. 65, 9 South. 129); *Walburn* v. *Chenault*, 43 Kan. 352 (23 Pac. 657); *Troup* v. *Horbach*, 53 Neb. 795 (74 N. W. 326).

IV. A gross and obvious overvaluation would be strong evidence of fraud. In such cases good faith may be shown. It is a question of fact: *Boynton* v. *Hatch*, 63 N. Y. 93; *Lake Superior Iron Co.* v. *Drexel*, 90 N. Y. 87.

V. Where the charter authorizes capital stock to be paid in property and the shareholders honestly and in good faith pay their subscriptions in property instead of money, third persons have no ground for complaint: *Coit* v. *North Carolina G. Amalg. Co.* 119 U. S. 343 (7 Sup. Ct. 231); *Bickley* v. *Schlag*, 46 N. J. Eq. 533 (20 Atl. 250).

VI. Property is not to be considered overvalued merely because it subsequently turns out to be so. Subsequent depreciation does not render stockholders liable: *Young* v. *Erie Iron Co.* 65 Mich. 111 (31 N. W. 814); *Turner* v. *Bailey*, 12 Wash. 634 (42 Pac. 115); *Carr* v. *LeFevre*, 27 Pa. St. 413; *American Tube Co.* v. *Hayes*, 165 Pa. St. 489 (30 Atl. 936); *Coit* v. *North Carolina G. Amalg. Co.* 14 Fed. 12, 18; *Bank of Fort Madison* v. *Alden*, 129 U. S. 372; 1 Cook, Stockholders (3 ed.), par. 35; 1 Cook, Corp. (4 ed.) par. 35, 36.

VII. There is no legal objection to the method of transfer adopted in this case: *Whitehill* v. *Jacobs*, 75 Wis. 474 (44 N. W. 630); *Anderson's Case*, L. R. 7 Ch. D. 75, 94.

For respondent there was a brief and an oral argument by *Mr. George William Pyle Joseph*, to this effect.

1. The trustee can maintain this suit, although the stock books show that full payment of the subscriptions has been made: *Burke* v. *Smith*, 83 U. S. (16 Wall.) 390; *Sawyer* v. *Hoag*, 84 U. S. (17 Wall.) 610, 617; *Scovell* v. *Thayer*, 105 U. S. 154.

2. Subscriptions for stock must be paid in money or money's worth: *Coyote G. & S. Min. Co.* v. *Ruble*, 8 Or. 296; *Brundage* v. *Monumental Min. Co.* 12 Or. 222 (7 Pac. 314); *Lee* v. *Imbrie*, 13 Or. 510 (11 Pac. 270); *Balfour* v. *Baker*

*City Gas Co.* 27 Or. 300 (41 Pac. 164); *Adamant Mfg. Co.* v. *Wallace,* 16 Wash. 614 (48 Pac. 415); *Kroenert* v. *Johnston,* 19 Wash. 96 (52 Pac. 608); *Manhattan Trust Co.* v. *Seattle I. & Coal Co.* 19 Wash. 493 (53 Pac. 927); *Van Cleve* v. *Berkey,* 143 Mo. 109 (42 L. R. A. 593, 44 S. W. 743); *Preston* v. *Cincinnati Ry. Co.* 36 Fed. 54; *Northwestern Mut. Life Ins.* v. *Cotton Exch. Co.* 46 Fed. 22; *Patterson* v. *Lynde,* 106 U. S. 250 (1 Sup. Ct. 432); *Coit* v. *North Carolina G. Amalg. Co.* 119 U. S. 343 (7 Sup. Ct. 231); *Lloyd* v. *Preston,* 146 U. S. 630 (13 Sup. Ct. 131); *Sprague* v. *National Bank of Amer.* 172 Ill. 149 (42 L. R. A. 606, 64 Am. St. Rep. 17, 50 N. W. 19); *Douglas* v. *Ireland,* 73 N. Y. 100; *Gamble* v. *Queens County Water Co.* 123 N. Y. 191 (9 L. R. A. 527, 25 N. E. 201); *Howe* v. *Illinois Agrl. Wks.* 46 Ill. App. 85; *Pickering* v. *Townsend,* 118 Ala. 351 (23 South. 703).

3. It is not necessary for the trustee, plaintiff herein, to prove an actual fraudulent intent, in order to invalidate the transaction alleged in the complaint, inasmuch as a gross overvaluation of the property received for stock is a fraud in law, and from the facts alleged and proven a gross overvaluation of the property transferred to the corporation appears: Clark, Corp. pp. 379, 380, 381.

MR. JUSTICE WOLVERTON delivered the opinion.

The gist of the controversy is that as to the creditors the stock was fraudulently issued as fully paid up, when in reality less than half of its par value has been so paid.

The conclusions of fact are not difficult of ascertainment. The Kaupisch Creamery owned certain property and merchandise which it had acquired in the course of five month's engagement in the creamery business; and, it being desirous of enlarging its business and placing its management in the hands of a corporation, Banfield and Rand purchased a half interest therein, so that nominally, and for the time being, they became partners with

the Kaupisches. For the purpose of ascertaining the value of the property of the partnership, an inventory was taken, which showed a valuation of $4,700. It was then agreed between all the parties concerned, with the view of making Banfield and Rand equal in the investment with the Kaupisches, that they should contribute or pay into the concern the sum of $5,000, which they did. That $1,000 was used by the Kaupisches to pay certain indebtedness of the company for butter consignments from the East, can have no special bearing in the case. It does not lessen the amount of Banfield and Rand's contribution to the business, which was designed to make them equal with the Kaupisches; the contribution of the Kaupisches being the property formerly belonging to the Kaupisch Creamery, under which name they were engaged as partners. A bill of sale was given at the time by the Kaupisch Creamery and the Kaupisches to Banfield and Rand, describing the property set over as "an undivided one half interest in and to all of the plant, stock, book accounts, and good will of said business." There appears to have been no stipulation that it should be free from incumbrance, or that the concern was free from debt, but only that it was agreed that the Kaupisches, as partners, should, for the consideration of $5,000 to be paid into the concern, sell and transfer to Banfield and Rand an undivided half interest in the business; the effect being that Banfield and Rand were taken into the company as equal partners with the Kaupisches, the company still being obligated to pay the indebtedness of the concern. This seems to us to have been the exact status of the parties after the sale of the one half interest in the business of the Kaupisch Creamery to Banfield and Rand, and prior to the completion of the organization of the Kaupisch Creamery Company, and the transfer to it of the property of the Kaupisch Creamery. On the completion of the organi-

zation, all of the property described as "all of the plant, stock, machinery, and good will of the said business," was transferred to the corporation by bill of sale regularly executed by the Kaupisch Creamery, the Kaupisches, and Banfield and Rand. The consideration named as the inducement for this transfer is $16,000, besides which the Kaupisch Creamery paid over and turned into the treasury of the Kaupisch Creamery Company the sum of $4,000. These sums, aggregating $20,000, constituted the consideration for the issuance of 800 paid-up shares of the capital stock of the corporation to the several parties named in the statement above; they having formerly subscribed for the same. Thus the corporation became invested with the property of the Kaupisch Creamery, and thus it is that the stockholders named acquired their stock, so that the transactions clearly indicate what the exact consideration was which the subscribers paid for their stock.

It will be noted that the bill of sale by the Kaupisch Creamery to Banfield and Rand describes the property designated for transfer in precisely the same language as the bill of sale to the corporation, with the exception that the words "book accounts" are included in the former; both containing the words "good will of said business." Evidently, therefore, that particular species of property was in the minds of the parties while agreeing upon and consummating both transactions, and was especially made the subject of transfer in each case. In the former, the good will, together with the other property of the Kaupisch Creamery, was considered the equivalent of $5,000 in value, and nothing more, for that sum is what Banfield and Rand paid into the concern in order that they might become one half owners in the whole. There was some indebtedness of the concern, but this, from the result of the transaction, was to be shared by all the parties, and was in fact paid out of the business, so that here we have

the estimate of the parties concerned as to the value of the good will. When, however, these parties transferred the identical property to the corporation, which was practically organized by themselves, they fixed a valuation of $16,000 as its worth to the company; exceeding by more than three times the value placed upon it in the first transfer, although the two transfers were made in point of time with but a single day intervening. Further than this, the Kaupisch subscribers to the capital stock and Banfield and Rand on January 27th, the day of the transfer of one half interest in the property of the Kaupisch Creamery to Banfield and Rand, entered into a written agreement whereby the Kaupisches, on the one part, agreed to take 400 shares of the capital stock of the Kaupisch Creamery Company, and to pay therefor $2,000 in cash, and the remainder, or $8,000, in the plant, stock, and good will of the creamery business, and Banfield and Rand, on the other part, agreed to take a like number of shares, and to pay therefor in like manner as the Kaupisches were to pay for their stock; and it was further agreed between the parties so designated and subscribing that they should not sell to any outside party, and that, in case either of them desired to sell, the other should have the option to purchase, at $12.50 per share; stipulating as liquidated damages in case of a breach of the condition the rate of $12.50 per share for each and every share so otherwise sold. Banfield and J. C. Kaupisch, testifying in the case, however, gave it as their honest conviction that the plant, stock, and good will of the partnership were fully worth the valuation placed upon them by this agreement, namely, $16,000, and that the board of directors received them, together with the $4,000 cash, in entire good faith, in payment for said stock. But speaking further of this last-mentioned agreement, and in explana-

45 OR.——36

tion of its purpose, Kaupisch says : "Well, if one wanted to drop out, we only paid $5,000. That was just among ourselves. If he had $10,000 worth of stock, and only paid $5,000 for it, then may be he could force the other to ask $10,000 for it." Further on the following inquiries were made, and answers elicited :

"Q. You paid in $4,000 into the corporation?

A. $5,000. I believe the books show the corporation got the benefit of $4,000 in cash. * *

Q. You were paying for $10,000 worth of stock with $5,000?

A. That was the proposition.

Q. You paid $12.50 a share for your stock, was it not? You paid just half ?

A. Yes, sir ; that would be $12.50.

Q. But if anybody else came in afterwards and subscribed for stock, you were going to charge them $25 a share?

A. That was the idea."

This theory of the transaction is borne out by Dey, who was desirous at one time of procuring some of the stock, but refused to purchase because he could not obtain it on the same basis at which the parties had procured theirs, namely, at the rate of fifty per cent of the par value. There is scarcely a doubt, therefore, that these parties procured their stock at not to exceed fifty per cent valuation, and that they so understood it, although they speak in the record to the contrary, by giving it as their opinion that the property and good will of the partnership were of the actual value they placed thereon in making the transfer to the Kaupisch Creamery Company. To conform to their estimate, the good will of the concern must have been of enormous value, namely, the difference, at least, between the sum of $4,700 and $16,000, or $13,300. The Kaupisch Creamery had been running but five months, starting with an investment of $2,000. True, the profits

during that time were estimated at $2,300, and the business was extensive ; but, with all this, it is impossible that the good will should be worth several times the capital invested. It is argued that the inventory was made on the basis of the cost price, and it is pointed out that one machine was valued at $150, its cost price, whereas its real value was $2,000. This is the only article specifically mentioned upon which stress is laid, but the claim for it is seriously controverted by the evidence, and, upon the whole, it is manifest that the contention lacks support. The inventory was probably made as other inventories usually are where there is to be a sale or transfer of the property involved for the purpose of arriving at substantial values, so that a basis may be had for intelligent dealing with reference to it. It is plain, therefore, that either by design or through bad judgment there was the grossest kind of overvaluation of this property to be taken in payment for the stock to be issued by the corporation to these subscribers, and that they did not really pay to exceed fifty per cent of the par value therefor. Such being the conclusion as to the fact, we are now to inquire as to the law applicable in the premises.

1. The appellant's contention is that the corporation, through its board of directors, exercised its best judgment as to values, and acted in entire good faith in accepting the property, including the good will of the partnership concern, in full payment of the capital stock issued, and therefore the transaction is unimpeachable at the suit of creditors ; in other words, the stockholders must be held to be exonerated from all liability to the corporation for the benefit of the creditors, except in case of actual fraud charged against the corporation and stockholders, and affimatively proven. That a suit in equity is maintainable by a creditor, or one standing in his stead, to recover against the stockholder of an insolvent corporation an

unpaid balance of his stock subscription, must be deemed
to be settled law in this State ; the liability being not to
the creditor, but for the indebtedness to the corporation,
which is treated as an asset, and to which the creditor is
entitled in the adjustment of legal demands against the
corporation : *Ladd* v. *Cartwright,* 7 Or. 329 ; *Falco* v. *Kau-
pisch Creamery Co.* 42 Or. 422 (70 Pac. 286); *Patterson* v.
*Lynde,* 106 U. S. 519 (1 Sup. Ct. 432). By the mandate of
our constitution, stockholders are made liable for the in-
debtedness of the corporation to the amount of their stock
subscribed and unpaid : Const. Or. Art. XI, § 3. In pur-
suance of this clause, it was early enacted that "all sales
of stock, whether voluntary or otherwise, transfer to the
purchaser all rights of the original holder or person for
whom the same is purchased, and subject such purchaser
to the payment of any unpaid balance due, or to become
due, on such stock ; but, if the sale be voluntary, the
seller is still liable to existing creditors for the amount of
such balance, unless the same be duly paid by such pur-
chaser": B. & C. Comp. § 5065. There is an amendment
to this statute, but it came at a time subsequent to the
transactions upon which the present suit is founded :
Laws 1903, p. 212.

2. These enactments, both fundamental and legislative,
indicate quite clearly the policy of the lawgiver touching
the payment of stock· by a subscriber. His liability is to
the full amount of the capital stock subscribed. The
directors of a corporation, in the absence of a constitu-
tional or statutory inhibition to the contrary, may receive
property in payment for stock in any case in which they
are authorized under the charter or articles of incorpora-
tion to purchase for the benefit of the corporation, and to
subserve the purposes for which it is organized: Clark,
Corp. 379. Of course, ordinarily, where there has been
no agreement with the directors that the subscriber for

stock might pay for it in property, the obligation is to pay in money, and when so payable there can be no possible cavil as to the amount that would be required to meet his liability. It must be the equivalent of the par value of his stock. Money is admittedly the standard of all values, and it is a natural sequence that, if stock liability is to be discharged in property, the property should measure up to a money value. Such is, no doubt, the plain intendment of the law ; otherwise it might easily be so managed that stock subscribers would be virtually exonerated from their statutory liability by pretended and simulated agreements with the directors, and the corporation left without assets of material moment from the beginning, which would atrociously belie the representations made by the articles of incorporation touching the capital stock. Such is not the spirit of the law, nor has it been so where there were no statutory regulations upon the subject ; the common declaration being that the stock must be paid in money or money's worth — that is, what may fairly and justly be considered as money's worth : *Wetherbee* v. *Baker*, 35 N. J. Eq. 501, 513; *Van Cleve* v. *Berkey*, 143 Mo. 109 (44 S. W. 743, 42 L. R. A. 593, 598); *Fogg* v. *Blair*, 139 U. S. 118 (11 Sup. Ct. 476); *Camden* v. *Stuart*, 144 U. S. 104 (12 Sup. Ct. 585); *Elyton Land Co.* v. *Birmingham W. & E. Co.* 92 Ala. 407, 423 (9 South. 129, 12 L. R. A. 307, 25 Am. St. Rep. 65).

3. We deem it important in this connection to state the basis of the stockholders' liabilities for the benefit of the creditors of the corporation, in view of the theory advanced that a subscription to the capital stock of the corporation is a mere contract of purchase, in which there is no element of trust; that the corporation, on the one hand, and the subscriber, on the other, are the parties to the contract — one to deliver stock, and the other to pay therefor; that the board of directors may determine how and in what

manner stock payments may be made; and that if the parties concerned, acting *bona fide,* mutually agree upon the terms of the contract, including the manner in which stock ' obligations shall be discharged, the transaction should be held valid, except for fraud, or a course of dealing tantamount thereto, the same as if the contract were made between parties *sui juris.* There is a familiar doctrine, commonly called the "American doctrine," that the capital of the corporation constitutes a trust fund for the benefit of the creditors, which is said to rest upon the equitable consideration that the distribution of the capital stock among stockholders without making adequate provision for the payment of debts, or the issuance of fictitious paid-up stock, is a fraud upon creditors contracting with the corporation in reliance upon its capital remaining intact, or in reliance upon the professed capital having been in fact paid up in full: *First Nat. Bank* v. *Gustin Min. Co.* 42 Minn. 327, 332 (44 N. W. 198, 6 L. R. A. 676, 18 Am. St. Rep. 510). The doctrine, taken in its fullest signification, is severely criticised as in itself inadequate, and as affording an erroneous basis upon which to found the creditor's remedy. His right of recourse to obligations for unpaid stock is no more sacred or operative than his. right to any other asset of an insolvent corporation. The corporation may undoubtedly dispose of its assets as it may see fit while a going concern, its charter permitting; and, if in the mean time it has fairly disposed of stock subscriptions (that is to say, collected the just demands arising therefrom, and in good faith disposed of the proceeds), there can arise no trust with reference to it, any more than there could for any other asset that has passed through and out of its hands. It is only when the unpaid capital becomes an asset of an insolvent concern that it is impressed with a trust in favor of creditors. And so it is with an individual or any ordinary partnership. All assets

in their insolvency become trust funds for the benefit of creditors.

Perhaps a more reasonable and substantial ground for the liability is that promulgated by Mr. Justice MITCHELL in *Hospes* v. *Northwestern M. & C. Co.* 48 Minn. 174, 197 (50 N. W. 1117, 1121, 15 L. R. A. 470, 31 Am. St. Rep. 637). He says: "By putting it [the liability] upon the ground of fraud, and applying the old and familiar rules of law on that subject to the peculiar nature of a corporation, and the relation which its stockholders bear to it and to the public, we have at once rational and logical ground on which to stand. The capital of a corporation is the basis of its credit. It is a substitute for the individual liability of those who own its stock. People deal with it and give it credit on the faith of it. They have a right to assume that it has paid-in capital to the amount which it represents itself as having; and if they give it credit on the faith of that representation, and if the representation is false, it is a fraud upon them; and, in case the corporation becomes insolvent, the law, upon the plainest principles of common justice, says to the delinquent stockholder, 'Make that representation good by paying for your stock.' It certainly cannot require the invention of any new doctrine in order to enforce so familiar a rule of equity. It is the misrepresentation of fact in stating the amount of capital to be greater than it really is that is the true basis of the liability of the stockholder in such cases; and it follows that it is only those creditors who have relied, or who can fairly be presumed to have relied, upon the professed amount of capital, in whose favor the law will recognize and enforce an equity against the holders of 'bonus' stock"—or, we may add here, stock the payment of which, either in full or in part, has been merely simulated, and not in reality made as contemplated by the relationship under the law.

4. Now, to recur to the initial contention: It is, no doubt, the doctrine of some of the cases that, where the directors have acted in good faith and according to their best judgment in fixing and agreeing with the shareholders as to the value of the property to be taken and accepted in payment of stock subscriptions, their acts in the premises are unimpeachable, and can only be annulled or set aside for actual — that is to say, intentional or active — fraud, which must be affirmatively shown. But there are other cases holding to what we deem to be the sounder view, being the better calculated to inculcate fair dealing and meet the ends of right and justice. We quote from *Coleman* v. *Howe*, 154 Ill. 458, 469 (39 N. E. 725, 727, 45 Am. St. Rep. 133), in exemplification: "Where property whose value is well known or can be easily learned is taken at an exaggerated estimate, a strong presumption is raised that the valuation is not in good faith, and is made for a fraudulent purpose. This presumption will be conclusive, unless rebutted by satisfactory evidence explanatory of the apparent fraud. Where the overvaluation is so great that the fraudulent intent appears on its face, and is not explained, the court will hold it to be fraudulent as matter of law." So, in *National Tube Works Co.* v. *Gilfillan*, 124 N. Y. 302, 307 (26 N. E. 538, 539), the court, speaking through Mr. Justice VANN, say: "The fraud is consummated by the issue of stock as full-paid stock * * which has not been fully paid, * * and it does not depend upon any fraudulent intent, other than that which is evidenced by the act of knowingly issuing stock for property to an amount in excess of its value." The language of Mr. Justice FIELD is: "But where full-paid stock is issued for property received, there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account. A gross and obvious overvaluation of property would be strong evidence of fraud": *Coit*

v. *N. Car. G. Amalg. Co.* 119 U. S. 343, 345 (7 Sup. Ct. 231, 233). To a like purpose is *Whitehill* v. *Jacobs*, 75 Wis. 474 (44 N. W. 630), although the syllabus would seem to limit the rule. See, also, *Young* v. *Erie Iron Co.* 65 Mich. 111, 123 (31 N. W. 814). Fraud in law is therefore as effective to impeach the transaction in favor of creditors as fraud in fact; the difference being that in the one case the law raises the intent from the nature of the transactions, while in the other it must appear by affirmative proof, and, the intent being presumed, it must be rebutted, or the law will declare the act fraudulent. One is as vicious in circumventing right and justice as the other.

5. If, however, the nature of the property and the extent of the overvaluation are such that the excess valuation may have possibly been due to error in honest conviction or judgment, then, to render the transaction invalid, actual fraud must be shown, and it is one of fact, the real question in cases of this character being whether the property was placed and taken at a high valuation with a fraudulent intent of evading the plain mandate of the law. It is competent for the determination of the question to take into consideration the nature of the property, the purposes for which it is accepted, and all the conditions and circumstances attending and surrounding the transaction; and if, from the whole, it appears that the board has acted in good faith, in the honest exercise of its best judgment, no adverse presumption impeding, then are its acts conclusive, otherwise not: Clark, Corp. 380, 381; *Van Cleve* v. *Berkey*, 143 Mo. 109 (42 L. R. A. 593, 598, 44 S. W. 743); *Boynton* v. *Andrews*, 63 N. Y. 93; *Douglass* v. *Ireland*, 73 N. Y. 100; *Lake Superior Iron Co.* v. *Drexel*, 90 N. Y. 87; *Elyton Land Co.* v. *Birmingham W. & E. Co.* 92 Ala. 407, 423 (25 Am. St. Rep. 65, 12 L. R. A. 307, 9 South. 129); *Osgood* v. *King*, 42 Iowa, 478; *Jackson* v. *Traer*, 64 Iowa, 469 (20 N. W. 764, 52 Am. Rep. 449).

6. When stock is issued for property taken at an over-valuation, it is competent to compel the stockholder to respond for the difference between the actual value of such property and the par value of the stock: *Coleman* v. *Howe*, 154 Ill. 458, 469 (45 Am. St. Rep. 133, 39 N. E. 725, 727); *Jackson* v. *Traer*, 64 Iowa, 469. In this view of the law, there is but one conclusion to be reached. There was an exaggerated and gross overvaluation of the property, and the presumption of bad faith thereby engendered has not been satisfactorily explained away or rebutted. But when the fact is considered in connection with all the other facts disclosed by the testimony, we are convinced that there was a scheme having in contemplation from the beginning the issuance of this stock as fully paid up, for a consideration not to exceed one half of its par value, and that actual fraud has been shown. We find, therefore, that the other half of the stock is unpaid, and in this particular alone will the findings of the trial court be modified. It does not change the result, however, and the decree of the trial court will be affirmed.

In this opinion we have considered the liability of a subscriber to the capital stock of a corporation — not one who comes by it by purchase or otherwise — to a creditor dealing with the company subsequent to the issuance of the stock without knowledge of the true basis upon which it was issued. Furthermore, we pass no opinion on the intendment of the amendment in 1903 of Section 5065, B. & C. Comp. It is not involved in this controversy, having been enacted subsequent to the time when the rights and liabilities of the parties herein became fixed.

AFFIRMED.