Argued July 25, decided September 9, rehearing denied December 2, 1913.

## JOPLIN *v.* NUNNELLY.*

### (134 Pac. 1177.)

**Corporations—Sale of Shares—Validity—Fraudulent Representations —Evidence.**

1.   Evidence, in a suit for the cancellation of a note, executed for the purchase price of stock in a corporation, *held* to show that defendant, at the time of the sale, represented to plaintiff that the shares were fully paid up and nonassessable; that plaintiff believed the representation, and acted upon it; that the representation was false, and defendant knew, or should have known, it to be so.

   [As to fraudulent and overissued corporate stock, see note in 87 Am. St. Rep. 847. As to the effect of fraud on subscriptions to stock, see note in 3 Am. St. Rep. 824.]

**Corporations—Fraudulent Sale of Property to the Corporation—Sufficiency of Evidence.**

2.   Evidence, in a suit for the cancellation of a note, given for the purchase price of corporate stock, *held* to show that a sale by the directors to the corporation of a recipe was fraudulent, and a scheme by which they intended to obtain more than four fifths of all the stock of the corporation, without paying anything therefor.

**Fraud—Fraudulent Representations—Reliance on Representation.**

3.   When a person makes representations of fact to another which he knows not to be true, or when the circumstances are such that the law imputes to him knowledge of their untruthfulness, and the person to whom the representations were made believes them to be true, and acts on them to his injury, the person making the representations is guilty of "fraud."

———————

*On the question whether statements made without knowledge of falsity constitute ground of action for fraud, see note in 18 L. R. A. (N. S.) 379.                                                        REPORTER.

From Multnomah: HENRY E. McGINN, Judge.

This is a suit by Ferdinand Joplin against B. W. Nunnelly wherein a decree was rendered in favor of plaintiff and defendant appeals. The facts are fully set forth in the opinion.        AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Loyal H. McCarthy.*

For respondent there was a brief and an oral argument by *Mr. George W. Stapleton.*

Department 1.  MR. JUSTICE RAMSEY delivered the opinion of the court.

1, 2. This suit was brought to obtain a decree for the cancellation of a promissory note for $2,200, and interest, executed by the plaintiff to the defendant, at Portland, on May 30, 1910. The note is negotiable, and it was payable one year after its date. The plaintiff alleges that there was a total failure of consideration for the execution of said note, and that he was prevailed upon to execute it by the false and fraudulent representations of the defendant. Said promissory note was executed for the purchase price of 32 shares of the capital stock of the Willamette Valley Condensed Milk Company, the par value of each of said shares being $100, and the par value of the 32 shares being $3,200, and there was no other consideration for the execution of said note. Said stock was evidenced by several certificates, which were properly assigned and delivered to the plaintiff, and on the face of each certificate was printed the words: "Fully paid. —Nonassessable." The plaintiff alleges and swears that the defendant went to him and asked him to buy this stock, and that he then asked the defendant whether it was paid up and nonassessable, and that the

defendant represented to him that it was, and that the plaintiff believed this representation, and, acting on it, purchased said stock and executed said note for the purchase price thereof. He claims, also, that said representation. was false and fraudulent, and that the defendant knew it to be false when he made said representation. He claims, also, that said stock was worthless, and that it was assessable for the debts of said company. The defendant admits that he sold said stock to the plaintiff, and that the note referred to was given for its purchase price, but he denies, both in his answer and in his evidence, that he represented to the plaintiff that the stock was fully paid or nonassessable. However, he admits that when he sold the stock to the plaintiff he wanted the plaintiff to believe that it was fully paid up and nonassessable, and he claims that *he* believed at that time that said stock was fully paid and nonassessable.

The evidence shows that on June 15, 1906, A. B. Olston, W. W. Avery and Otto Olston, incorporated a company called the ''Cream Aid Manufacturing Company,'' with a capital stock of $20,000 divided into 200 shares of $100 each, and that said incorporators and F. G. Olston subscribed for 165 shares of said stock of the par value of $16,500, leaving unsubscribed only $3,500. All of said stockholders were elected directors and officers of said company. At the meeting at which said stockholders were elected, they purchased *from themselves* for said company a recipe for manufacturing a so-called food product, by them called ''Cream Aid,'' and they agreed that said company should pay them for said recipe $16,500, and at the same time they passed a resolution whereby they attempted to accept, from themselves, for the company, said recipe in full payment for their said stock subscriptions, aggregating said sum of $16,500. Said resolution declared their subscriptions to said stock ''fully paid'' and ''nonas-

sessable.'' An analysis of said "Cream Aid" showed that it was composed of cornstarch, sugar, saleratus, salt, and water. The defendant produced in evidence an unsworn statement by a sawmill company, to the effect that said company had used said "Cream Aid" at its boarding-house, and said company certified that it was a "great money-saver," and that, when used with condensed cream, it was highly satisfactory both to the cook and the boarders. This statement recalls the fare furnished the students at Dotheboys Hall, as related by Dickens, where Squeers, at intervals, fed the boys on brimstone and treacle, because, as Mrs. Squeers averred, it purified their blood and spoiled their appetites, and came cheaper than breakfast and dinner. According to the evidence, this "Cream Aid" was worthless, and the company never realized anything from it.

On April 4, 1907, said Cream Aid Manufacturing Company increased its capital stock from $20,000 to $100,000, and the new stock was divided into 1,000 shares of $100 each, and a resolution was passed by said company allowing the stockholders holding shares of the original stock to surrender said stock to the company, and to receive in exchange therefor five shares of the new stock for each share held by them of the old stock. The four holders of the $16,500 of the old stock surrendered it to the company, and received from the company, without paying anything therefor, $82,500 of the new stock, leaving only $17,500 of said stock to be sold for funds with which to carry on the business. Thereafter said company changed its name to the Willamette Valley Condensed Milk Company. The defendant purchased from one of the Olstons, $9,000 of the stock, for which the company had received nothing, for $250, and his partner, Murdock, at the same time purchased, with the knowledge of the defendant, $9,000 of said stock, for which the company had been paid

nothing, for $250. The defendant and said Murdock were partners, and officed together, and while they were thus officing together, Murdock was agent for said company to sell its treasury stock, and all the books and records of the company were in said office, and for a time the defendant was bookkeeper for said company, and had charge of all its books and records. This was before he sold said stock to the plaintiff. While he was bookkeeper for the company, at the request of J. Woods Smith, president and manager of the company, and before he sold the stock to the plaintiff, the defendant made a statement in the books of the company in regard to the pretended assets of the company, as follows:

| | |
|---|---:|
| Cream Aid process | $20,000 00 |
| McMinnville Water Franchise | 20,000 00 |
| Contract with Chevally et al. (estimated) | 20,000 00 |
| Factory site, buildings, and land | 8,900 00 |
| Treasury stock on hand | 28,100 00 |
| Bills receivable | 3,000 00 |
| Total | $100,000 00 |

The first three items in said account were of no value, and the defendant admits in his evidence that he knew that they were worthless when he made said entries, and he practically admits that he knew, when he entered said statement, that it was made to cover up the financial condition of said company, and to deceive persons interested in its business. But he tries to excuse himself for making said entries by saying that the president told him to do it, and that he had to obey his commands. The item of $8,900 for factory site and buildings and ground was false and fraudulent, in that no building had at that time been erected, and the site and ground cost the company less than $2,000. The pretended McMinnville Water Franchise was a myth, and had been canceled prior to the making

of said statement, and the Chevally contract had also been canceled with the consent of the company prior to the making of said statement.  How much stock the company then had in the  treasury we do not  know. But the evidence shows that they had long before that issued, without receiving anything of value therefor, $82,500 of their total capital stock, leaving in the treasury only $17,500 of stock.   The item of $3,000 in bills receivable was correct.   From the evidence, it appears that when said statement was entered in the books by the defendant, all the assets that the company had were the $3,000 in bills receivable, and the factory site, worth about $2,000, making its total assets amount to only $5,000 besides whatever stock it had in the treasury.   The evidence shows  that  the defendant knew that $60,000 of the pretended assets of the company as shown by his entries in the books were false and fraudulent.   The defendant had the books and records of the company in his hands, and it was his duty, as bookkeeper of the company, to refuse to make false entries.

We conclude from the evidence that more than four-fifths of the $100,000 capital stock of said company was unadulterated "water," for which the company never received anything of value, and that the issuance of said "watered" stock was a gross fraud upon the company and its creditors.

We conclude from the evidence, also, that the defendant, when he sold said 32 shares of stock to the plaintiff, for the purpose of prevailing on the plaintiff to buy them, represented to the plaintiff that they were fully paid stock and nonassessable, and that the plaintiff believed said representation, and acted on it and purchased said stock and executed said note for the agreed purchase price, and that said representation was false, and that the defendant either knew or should have known that it was false.   He had had possession

of all the books and papers of the company as its book-keeper, and he admits that he knew, when he made the entries in the books, that $60,000 of its pretended assets were a myth. If he knew that, he must have known that nothing was received for most of its stock, because the company had done practically no business, and had only about $5,000 in real assets to show for more than $80,000 in stock disposed of.

The plaintiff contends and swears that he did not know, when he bought the stock of the defendant, that it was "watered," or that any stock had been issued without its being paid for. He says that he believed that all the stock had been paid for, and that he relied on the defendant's representation that the stock that he purchased of him was paid-up stock and nonassessable. Some time before he bought the stock of the defendant, he purchased from the company through its president, Smith, $3,000 in the stock of the company, and gave his note for it and paid the note, paying for that stock in money at its par value. That is a strong fact corroborating his contention that he believed, when he bought the stock of the defendant, that it was paid up and nonassessable. We find, from a preponderance of the evidence, that the plaintiff did believe, when he purchased said stock and gave his note for it, that it was paid up and not assessable. It is true that he was a director of the company a while, but the directors had only about three meetings while he was a director, and these meetings were close together, and he never looked over the books or records of the company, and never had possession of them.

Article XI, Section 3 of the Constitution of this state fixes the liability of stockholders as follows: "The stockholders of all corporations * * shall be liable for the indebtedness of said corporation to the amount of their stock subscribed and _unpaid,_ and no more."

Section 6696, L. O. L., provides: "All sales of stock, * * transfer to the purchaser all rights of the original holder or person from whom the same is purchased, *and subject such purchaser to the payment of any unpaid balance* due, or to become due, *on such stock;* * * provided, that any corporation formed under the laws of this state may purchase real or personal property, * * and issue stock *to the amount of the value thereof* in payment therefor, and the stock so issued shall be fully paid stock and not liable to any assessments; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased shall be conclusive," etc. ·

The issuance of stock to the four directors of the company to pay for the "Cream Aid" recipe, referred to *supra,* was a gross fraud. The recipe was valueless, and the directors sold it to the company originally for $16,500 in stock, and shortly afterward increased the amount of the capital stock fivefold, and had issued to themselves $82,500 of the increased capital stock in lieu of the original $16,500, which they had obtained without paying anything for it. The issue of all of this stock to them was actually and grossly fraudulent. It is clear from the evidence that the pretended sale of the recipe by the directors to the company was not made in good faith, and that it was a scheme by which they intended to obtain more than four fifths of all of the stock of the company without paying the company anything of value therefor: See *Macbeth* v. *Banfield,* 45 Or. 553 (78 Pac. 693, 106 Am. St. Rep. 670).

We find that nothing was paid for the $82,500 of the capital stock issued to the three Olstons and Avery, and that the $3,200 of stock sold by the defendant to the plaintiff was a part of the stock, and that the company has received nothing for it. Under the sections of the Constitution and statute cited, *supra,* this stock which was sold to the plaintiff was not paid for, to the

company, and it was and is assessable for the debts of the company, a bankrupt concern.

The purchase of this recipe was not made from a person unconnected with the company. The vendors and the directors of the company who purchased the recipe were the same persons. The defendant, when he sold the stock to the plaintiff, exhibited to the latter certificates therefor, which stated that the stock covered by the certificates was fully paid and nonassessable, and the plaintiff testifies that the defendant expressly represented to him at that time that this stock was fully paid and nonassessable. While the defendant denies making that representation, we find by the weight of the evidence that he did make it, and that he knew or should have known that it was false. We find, also, that the plaintiff believed said representation to be true, and acted on it, and bought the stock, and executed the promissory note therefor.

3. When a person makes a representation of fact to another which he knows to be untrue, or when the circumstances are such that the law imputes to him knowledge of its untruthfulness, and such person believes the representation to be true and acts on it to his injury, the person making the representation is guilty of fraud.

Pomeroy's Equity (3 ed.), Section 884, says: "A definite statement of what a party does not know to be true, when he has no reasonable grounds for believing it to be true, will, if false, have the same legal effect as a statement of what the party positively knows to be untrue."

In Section 885 of the same book, the author states the rule *in equity* thus: "A person making an untrue statement, without knowing or believing it to be untrue, and without any intent to deceive may be chargeable with actual fraud in equity. Whatever would be fraudulent at law will be so in equity; but the equitable

doctrine goes further, and includes instances of fraudulent misrepresentations which do not exist at law.''

In 20 Cyc., page 27, the author says: ''It is not always necessary that the speaker should actually know that the representation is false. If the statement is of a matter susceptible of accurate knowledge, and he makes it recklessly without any knowledge of its truth or falsity, and in the form of a positive assertion calculated to convey the impression that he knows it to be true, the representation is equally fraudulent.''

In the case of *Cawston* v. *Sturgis,* 29 Or. 335, 336 (43 Pac. 657), (a law case), Mr. Justice BEAN says: ''An action of deceit will lie against one who makes a false representation of a material fact, upon which another acts to his injury, knowing it to be false, or when he makes it *recklessly* as of his own knowledge, without knowing whether it is true or not.''

In *Vaughn* v. *Smith,* 34 Or. 56, 57 (55 Pac. 99, 100), a suit for cancellation, Mr. Justice MOORE says: ''The defendants' representations with regard to the condition of the title to the premises being false in fact, though made, as the court finds, 'unthoughtedly,' and being relied and acted upon by the plaintiff, constituted such constructive fraud as will authorize a court of equity to treat the deed as an executory contract to convey and rescind the same. * * The defendants' representations, therefore, however innocently made, afford no defense to the suit.''

We find that the defendant's representation that said stock was fully paid and unassessable was false and fraudulent, and that the plaintiff is entitled to the relief for which he prays.

The decree of the court below is affirmed, and a decree will be entered rescinding the sale of said 32 shares of stock by the defendant to the plaintiff, perpetually enjoining the transfer by the defendant of said promissory note for $2,200 and interest made by

the plaintiff to the defendant May 20, 1910, requiring the defendant forthwith to deliver said promissory note to the clerk of the court below for the defendant, and requiring said clerk to cancel said note and then deliver it to the plaintiff, and for the recovery by the plaintiff from the defendant of costs and disbursements in both courts, and directing the clerk of this court to send to the clerk of the court below the certificates for said 32 shares of the stock sold to the defendant, and on file as exhibits in this court, and directing the clerk of the court below to deliver them on demand to the defendant or his attorney.

Affirmed : Rehearing Denied.

Mr. Chief Justice McBride, Mr. Justice Moore and Mr. Justice Burnett concur.