## MEIKLE v. EXPORT LUMBER CO.

### No. 7187.

Circuit Court of Appeals, Ninth Circuit.

Oct. 23, 1933.

Sidney Teiser, W. G. Keller, and Wm. K. Teiser, all of Portland, Or., for appellant.

V. V. Pendergrass and O. C. Roehr, both of Portland, Or., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

This appeal involves the allowance of the claim of the Export Lumber Company, in the sum of $73,843.39. Upon the trustee's objection, the referee held the claim not to be allowable under section 57g of the Bankruptcy Act (11 USCA § 93 (g). Upon review, the District Court reversed the order of the referee.

The written stipulation of facts filed with the referee accompanied his certificate on review. The stipulation recites, among other things, that on September 30, 1926, the bankrupt was indebted to appellee in the approximate amount of $100,000; that on September 20, 1928, the bankrupt sold to Hines Lumber Company substantially all of the assets of the bankrupt for the sum of $750,000, subject to a secured indebtedness of $250,000; that the bankrupt delivered to the purchaser a purported list of the creditors of the bankrupt appearing on its books, except those included in the Fred Herrick account; that subsequent thereto the bankrupt executed and delivered to the said Hines Lumber Company an authorization to distribute the proceeds of said sale to the bankrupt's creditors; "that pursuant to said authorization, the Hines Lumber Company did distribute the purchase price of said property in the manner therein provided, and did execute two checks, one in the sum of $37,677.19, and the other in the sum of $2,764.52; that the first check mentioned was delivered to and received by the Export, but that the second check was endorsed by Fred Herrick in the name of the Export and delivered to Armour & Company, a creditor of the Milwaukee Lumber Company, in payment of the debt owing by the Milwaukee Lumber Company to Armour & Company, such payment thus inuring to the benefit of the Milwaukee Lumber Company and not to the benefit of the Export; that, up to and including the time of the payment of said sum of money, Fred Herrick was president and director and principal stockholder of both the Export and the Bankrupt, and that, at the time of said payment, both the Export and the Bankrupt were insolvent, but that the insolvency of the Bankrupt at the time mentioned did and does depend upon the inclusion in its liabilities of the claims of affiliated companies, viz.: the Export and the Milwaukee Lumber Co. and of Fred Herrick personally; that the sum of $37,677.19 received by the Export, as hereinabove stated, was turned over and delivered to Conrad Johnson, Vice-President and General Manager of the Export, and by him deposited to the credit of the Export and used by the Export in the payment of labor claims and taxes for which the Export was at that time legitimately indebted, and that no part thereof inured to the benefit of Fred Herrick personally or of any other stockholder, director or officer of the Bankrupt; that, at the time of such payment, the Export was indebted to various and diverse creditors on legitimate obligations, in a sum in excess of the value of its assets; that, a short while subsequent to the payment of said sum of money to the Export, the Export passed into the possession and under the control of its creditors, and that the Export is now managed and controlled by a Board of Directors and officers representing its creditors; that the Export has not sufficient assets with which to pay its existing indebtedness, and that the stockholders of the Export have not benefited and

will not benefit as a result of the payment hereinabove mentioned."

The payment to appellee of approximately $40,000 was made on or about October 4, 1928. Thereafter it filed in the bankruptcy proceeding a claim for the sum of $73,843.39, which was duly allowed by the referee.

On November 8, 1932, appellant filed with the referee his "Objections to allowance of claim of Export Lumber Company," which reads as follows: "Comes now J. D. Meikle, Trustee of the above entitled cause, through his attorney Sidney Teiser and objects to the allowance of the claim of the Export Lumber Company in the amount of $73,843.39, or in any amount for the reason that the Export Lumber Company on or about the 4th day of October, 1928, was paid by, or out of the funds of, the Fred Herrick Lumber Company the sums of $37,677.19 and $2,764.52, and at the time of the payment to it of such sums, Fred Herrick Lumber Company was insolvent and that at the time of said payment of said sums to the Export Lumber Company, the said Fred Herrick Lumber Company contemplated a discontinuance of its business, and in fact had discontinued its business, and that the payment by the Fred Herrick Lumber Company to it of said sums and the receipt of said sums by the said Export Lumber Company was in contravention of the trust fund doctrine applicable to corporations organized and existing under the laws of the State of Oregon, since the Export Lumber Company received a larger proportion of its claim than other creditors received or would receive: namely, Allis-Chalmers Mfg. Co., Milwaukee Lumber Company, and others. And that, having received said sums, as aforesaid, it, the said Export Lumber Company, has not surrendered said money paid to it, as required by section 57 (g) of the Bankruptcy Act; and said J. D. Meikle, Trustee as aforesaid, through his attorney Sidney Teiser, moves that said claim of the Export Lumber Company, having been allowed, be reconsidered and rejected in whole, for the reasons above set forth."

In the findings and order rejecting the claim of the Export Lumber Company, the referee stated:

"The question now to be determined is whether this payment to the Export Lumber Company constituted a preference, as contended by the trustee; if so it may not, on that account, be paid a dividend until it shall have repaid to the trustee the said alleged preference.

"Were this payment questioned under the provisions of the Bankruptcy Act relating to unlawful preferences, it would, *should reasonable cause to believe be fastened upon the creditor,* be pronounced wholly void, *but those sections are not invoked and there is no proof produced therein. Instead the trustee seeks to establish the invalidity of the payment when tested under the rays of the Oregon trust fund doctrine, or what is asserted to be such doctrine."* (Italics our own.)

■ As stated above, this order was reversed. It thus appears that appellant's sole objection to the allowance of the claim was based upon the ground that the Fred Herrick Lumber Company was insolvent and that at the time of the payments of said sums to the Export Lumber Company the said lumber company contemplated a discontinuance of its business, and in fact had discontinued its business and that such payment of said sums *was in contravention of the trust fund doctrine applicable to corporations organized and existing under the laws of the State of Oregon.*

The referee considered, and the District Court disposed of, the matter solely upon the ground stated; and the assignments of error raise no other question.

Appellant, in his brief in this court, contends, however, that the referee's determination was correct, "not only on the grounds set forth by the Referee in his findings and order, but also on the further ground that under section 67e of the Bankruptcy Act, 11 US CA § 107 (e), the transfer (payment) was with the intent on the part of the bankrupt to hinder, delay or defraud some of its creditors."

We agree with the referee that the matter should be disposed of solely on the ground as set forth in the appellant's written objection. The matter will therefore be determined in accordance with appellant's original contention.

It is contended by the appellant and admitted by the appellee that "the law as expounded in the decisions of the Supreme Court of Oregon is the law applicable." They disagree, however, as to the effect of such decisions; the appellant contending that they make void transfers or payments by an insolvent corporation discontinuing its business, whereby one creditor is preferred over other creditors—the trust fund doctrine—and that such decisions have not limited the trust fund doctrine to apply only against creditors so preferred who are directors; and the appel-

lee contending that such doctrine applies only where the directors or stockholders are attempting to prefer themselves as creditors or sureties in respect to past advances, or have transferred all of the assets of the corporation to the prejudice of the general creditors.

On this point, the appellant cites the following Oregon decisions: Sabin v. Columbia Fuel Co., 25 Or. 15, 27–31, 34 P. 692, 35 P. 854, 42 Am. St. Rep. 756; Currie v. Bowman, 25 Or. 364, 383, 35 P. 848; Macbeth v. Banfield, 45 Or. 553, 566, 78 P. 693, 694, 106 Am. St. Rep. 670; Williams v. Commercial National Bank, 49 Or. 492, 499, 90 P. 1012, 1014, 91 P. 443, 11 L. R. A. (N. S.) 857; Garetson Lumber Co. v. Hinson, 69 Or. 605, 609, 140 P. 633, 635; Gantenbein v. Bowles, 103 Or. 277, 203 P. 614, 615; Umpqua Valley Bank v. Wilson, 120 Or. 396, 407, 252 P. 563; Security Savings & Trust Co. v. Portland Flour Mills Co., 124 Or. 276, 310, 261 P. 432.

At the outset, however, it is observable that the appellant himself eliminates three of the foregoing cases, as not being authoritative on the point in question. Of the Sabin and Currie Cases, supra, the appellant says: "Now let it be understood that Appellant is not citing these two Oregon cases as establishing the Trust Fund Doctrine in Oregon. We merely refer to them to give an early history of the treatment of this doctrine by the Courts in Oregon, and also to show in those cases, as heretofore stated, the corporations had not ceased to do business, as they had in the case at bar."

Similarly, of the Security Savings Case, supra, the appellant concedes: "Lest we be misunderstood, as we were by appellee in the court below, in quoting from the case of Security Savings & Trust Co. v. Portland Flour Mills Co., permit us to say that we are not quoting from this case as an authoritative holding concerning the trust fund doctrine, but we are merely calling attention to that case to show the recognition by the Oregon courts of the trust fund doctrine."

We have carefully examined and analyzed all the cases cited by the appellant on the question of the trust fund doctrine, and we agree with him that the three foregoing decisions are not authority "as establishing the * * * doctrine in Oregon." We will therefore omit these three cases from the analysis that follows.

We agree likewise with the learned referee that: "There is no decided case in Oregon where the alleged preferential payment caused a dispute between unsecured general creditors—creditors of the same class." But

we cannot go so far as to predict, as the referee has done, that, "when it [the Supreme Court of Oregon] has occasion to pass upon such a transaction," there is "no reason to suppose" that it will not adopt to "its full extent" the trust fund doctrine.

We turn, then, to the decisions by the Supreme Court of Oregon that are relied upon by the appellant.

In Macbeth v. Banfield, supra, the suit was one by a trustee in bankruptcy "to require * * * stockholders to respond for any balance of their stock that might be deemed unpaid, to the amount of the unpaid indebtedness of the concern." In that case, furthermore, actual fraud was found. After quoting with approval from a Minnesota case (Hospes v. Northwestern M. & C. Co., 48 Minn. 174, 50 N. W. 1117, 15 L. R. A. 470, 31 Am. St. Rep. 637), to the effect that "it certainly cannot require the invention of any new doctrine in order to enforce so familiar a rule of equity," the Oregon court clearly disclosed its theory of the case when it said: "When stock is issued for property taken at an overvaluation, it is competent to compel the stockholder to respond for the difference between the actual value of such property and the par value of the stock. [Cases cited.] In this view of the law, there is but one conclusion to be reached. There was an exaggerated and gross overvaluation of the property, and the presumption of bad faith thereby engendered has not been satisfactorily explained away or rebutted. But when the fact is considered in connection with all the other facts disclosed by the testimony, we are convinced that there was a scheme having in contemplation from the beginning the issuance of this stock as fully paid up, for a consideration not to exceed one half of its par value, and that actual fraud has been shown."

The Macbeth Case and the instant are easily distinguishable.

In Williams v. Commercial National Bank, supra, Wells, Fargo & Co. "absorbed the defendant bank for the purpose of continuing the business in its own name, and so dealt with said property, charged with full notice of the liability of the assets of the defendant bank for its debts, and took the same cum onere." Suit was brought against the bank and Wells, Fargo & Co. to collect from the latter judgments rendered in favor of the plaintiffs against the bank. The plaintiffs had defaulted in the payment of certain assessments on stock of the bank held by them, the assessments being required at the instance of new directors of the Wells, Fargo, who

controlled the bank even before the Wells, Fargo formally took it over. As a result of the default, the bank directors sold the plaintiffs' stock, and the plaintiffs each brought an action against the bank for the conversion. The actions were defended by the Wells, Fargo, and by it appealed to the state Supreme Court (41 Or. 359, 68 P. 806) and thereafter to the Supreme Court of the United States, with the result that there were entered final judgments in favor of the plaintiffs in the latter tribunal (192 U. S. 243, 24 S. Ct. 253, 48 L. Ed. 425). Executions being issued and returned nulla bona, the suit first referred to hereinabove was brought by the plaintiffs in the conversion action.

In that case, one of the principal questions was whether or not the Wells, Fargo should be held liable to the plaintiffs either as a stockholder for dividends received upon its stock, or by reason of having caused the liquidation of the bank and having taken over its assets. From the closing language of the decision, it is clear that the court rested its conclusions upon the fact that the Wells, Fargo had taken over all the assets of the bank, a situation that does not exist here, as between the Fred Herrick Lumber and the appellee. The latter received an alleged preferential payment of only $40,000, which represented but a small portion of the lumber company's total assets. In the Williams Case, the court said: "Therefore we conclude that the transfer by the defendant bank of all its assets to the defendant company [Wells Fargo] without provision for payment of its debts was a constructive fraud against the plaintiffs. * * * "

Indeed, the entire trust fund doctrine seems to have been limited by the Oregon Supreme Court in a later decision to cases involving the liquidation of a corporation by sale of all its assets to another company. In the recent decision in American Bank v. Port Orford Cedar Prod. Co., 140 Or. 138, 142, 12 P.(2d) 1014, 1015, decided on July 12, 1932, which has not been cited by counsel, we find the following illuminating statement by Chief Justice Henry J. Bean: "We fail to see the necessity of applying the 'trust fund doctrine.' That doctrine, however, was stated in Williams v. Commercial Nat. Bank, 49 Or. 492, 90 P. 1012, 91 P. 443, 11 L. R. A. (N. S.) 857, by Mr. Justice Eakin, in substance, that, where a corporation transfers all its assets with a view to going out of business, and nothing is left with which to pay its debts, the transferee is charged with notice of the circumstances of the transaction, and takes the assets subject to an equitable lien for the unpaid debts of the transferring company, the property of a corporation being a fund subject to be first applied to the payment of debts. [Citing the Umpqua Valley, Gantenbein and Macbeth Cases, supra.]"

But whether or not the Supreme Court of Oregon has limited the application of the trust fund doctrine only to cases where one corporation has turned over all of its assets to another corporation or to some individual or partnership, the Williams Case is assuredly no authority for the appellant's position. That is to say, the Williams Case does not hold that, in Oregon, a bona fide creditor of an insolvent corporation which is no longer a going concern, may not, fraud not being shown, receive a preferential payment of his debt, so far as the application of the trust fund doctrine is concerned.

Nor are the facts in Garetson Lumber Co. v. Hinson, supra, any more similar to those in the instant case. There, the suit was brought by a corporation that had sold most of its assets and had distributed the proceeds ratably to all its stockholders. By oversight, no provision was made for the payment of any debt that might be incurred subsequently to such distribution of the assets. Thereafter, a claim for $2,000 having been presented by a creditor, the holders of more than two-thirds of the stock authorized the directors to call upon the stockholders, of whom Hinson was one, to "refund" $4 per share of their stock. Hinson refused to pay his "refund," and the corporation brought suit. The court held that the corporation was not a proper party plaintiff, and that the suit should have been brought by the creditor, since the corporation was "in such a comatose state, preceding final dissolution," that it had "not sufficient vitality to institute or maintain a suit for the recovery of any part of a dividend paid out in liquidation." The case is clearly no authority for the application of the trust fund doctrine under the facts now before us.

The very first sentence in the case of Gantenbein v. Bowles, supra, reveals the essential difference between the facts of that case and those now before us: "This is a suit by C. U. Gantenbein against Joseph R. Bowles, Fred Rothchild, and Frederick S. Stanley, to subject the funds of the Willamette Building & Realty Company, a corporation, to the payment of the corporate debts and for an accounting by reason of certain acts of the directors in assigning to themselves rents of subtenants under a lease known as the Fleischner lease, which the corporation held as original lessee." Further on in the opin-

ion, we are informed that the defendants were the "sole stockholders of the Company, and the directors from the time of its inception until it went out of existence." Repeatedly in that opinion emphasis is laid upon the fact that the defendants were *directors* of the corporation, and it is plainly shown that this fact was, in the mind of the court, controlling. We quote, however, only from the concluding paragraph: "It would not be in conformity to equitable principles to allow the defendants, as directors of the Company, to place themselves in an advantageous position as creditors and defeat the judgment of plaintiff merely because of the position which they held as officers of the Company at a time when they knew that the Company could not pay all of its creditors."

The points of difference between that suit and the instant case, which involves simply a general, corporate creditor, are self-evident.

It is not necessary to rehearse the lengthy and complicated statement of facts in Umpqua Valley Bank v. Wilson, supra, to discover the fundamental distinction between that case and the one we are now called upon to decide. There, Wilson "was a stockholder and officer of the Fir-Pine Lumber Company, and made an agreement with Lystul and Lawson whereby he would cause the Fir-Pine Lumber Company to sell and convey to Lystul and Lawson all of its property, real and personal, excepting outstanding accounts, notes, and bills receivable, in consideration of Lystul and Lawson canceling and satisfying all indebtedness of Fir-Pine Lumber Company to them, and in addition thereto Lystul and Lawson agreed to assume and pay certain obligations of Fir-Pine Lumber Company. * * * As a further consideration for the transfer, Lystul and Lawson agreed to give the defendant an option to individually purchase all of the property transferred to Lystul and Lawson by the Fir-Pine Lumber Company for a price equal in amount to Lystul and Lawson's claim against the Fir-Pine Lumber Company plus the indebtedness assumed and agreed to be paid by Lystul and Lawson, such option to expire on the 1st day of February, 1923. * * * *" That the watchful eye of the equity court penetrated through this plan to further the personal interests of the defendant Wilson is clear from the following language of the court, at pages 405–406 of 120 Or., 252 P. 563, 566. In discussing the statute of frauds and the defendant's personal responsibility for the lumber company's debt to the bank, which, by an oral promise, he had assumed, the court said: "The defendant was interested in the Fir-Pine Lumber Company and had stock therein of the par value of $20,000. He was engaged in merchandising. It was to his interest and he desired to prevent the Fir-Pine Lumber Company being declared bankrupt. The deal made by him with Lystul and Lawson was to his advantage. As a part of the transaction Lystul and Lawson gave the defendant an option to purchase the property for a certain amount at any time within one year. This gave the defendant the benefit of any improvement in the market for the property that the Fir-Pine Lumber Company was selling to Lystul and Lawson. If during that time business conditions had been such that the value of the property had largely increased or doubled, Wilson would have had an opportunity to save a portion of the money he had invested in the lumber company. It was no doubt beneficial to him, in a business way, to obviate the corporation in which he was interested being adjudged bankrupt."

Here again emphasis is laid upon the fact that defendant, as officer and stockholder of the company, occupied a fiduciary relation toward the corporation, which precluded his attempting, though unsuccessfully, to benefit himself personally, even indirectly, in dealing with its assets.

In addition, however, to this element, in the Umpqua Case the other distinguishing factor was present, namely, the corporation transferred *all* of its assets to Lystul and Lawson. That this element weighed greatly with the court is likewise shown by the language that appears on page 407 of 120 Or., 252 P. 563, 566: "When defendant's corporation, Fir-Pine Lumber Company, transferred all its corporate property to Lystul and Lawson, leaving nothing to pay plaintiff's claim, this was not a transfer in the ordinary course of business, and Lystul and Lawson took the property subject to an equitable lien in favor of plaintiff and made the property a trust fund for the benefit of the creditors."

The facts in the Umpqua Case, and the weight given to them by the Supreme Court of Oregon, clearly distinguish that case from the instant controversy.

After a careful analysis of the above opinions of the Supreme Court of Oregon, we are of opinion that they do not sustain appellant's contention, and that the payment made to appellee is not void under any decision of such court, or any law of the state of Oregon.

■ Having ascertained that the Supreme Court of Oregon has never applied the trust fund doctrine to facts such as those presented by the instant case, we advert, finally, to

certain definite interpretations of the doctrine handed down by the Supreme Court of the United States.

The leading federal case on the subject is Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 381–383, 385, 386, 14 S. Ct. 127, 129, 37 L. Ed. 1113. With reference to the trust fund doctrine, the court used the following language:

"But it is earnestly insisted that it has been held by this court (Case v. Beauregard, 101 U. S. 688 [25 L. Ed. 1004]) that whenever a creditor has a trust in his favor, or a lien upon property for a debt due him, he may go into equity without exhausting his legal remedies; that it has also frequently been affirmed that the capital stock and assets of a corporation constitute a trust fund for the benefit of its creditors, which neither the officers nor stockholders can divert or waste; and several cases are cited,—among them, that of Sanger v. Upton, 91 U. S. 56 [23 L. Ed. 220],—in which, perhaps, the proposition is asserted in the most direct and emphatic language, and Terry v. Anderson, 95 U. S. 628, 636 [24 L. Ed. 365], in which Chief Justice Waite made these observations: 'Ordinarily, a creditor must put his demand into judgment against his debtor, and exhaust his remedies at law, before he can proceed in equity to subject choses in action to its payment. To this rule, however, there are some exceptions; and we are not prepared to say that a creditor of a dissolved corporation may not, under certain circumstances, claim to be exempted from its operation. If he can, however, it is upon the ground that the assets of the corporation constitute a trust fund, which will be administered by a court of equity, in the absence of a trustee; the principle being that equity will not permit a trust to fail for want of a trustee.'

"While it is true language has been frequently used to the effect that the assets of a corporation are a trust fund held by a corporation for the benefit of creditors, this has not been to convey the idea that there is a direct and express trust attached to the property. As said in 2 Pom. Eq. Jur. § 1046, they 'are not, in any true and complete sense, trusts, and can only be called so by way of analogy or metaphor.'

"To the same effect are decisions of this court. The case of Graham v. Railroad Co., 102 U. S. 148 [26 L. Ed. 106], was an action by a subsequent creditor to subject certain property, alleged to have been wrongfully conveyed by the corporation debtor, to the satisfaction of his judgment; and the very proposition here presented was then considered, and, in respect to it, the court, by Mr. Justice Bradley, said (page 160 [of 102 U. S., 26 L. Ed. 106]): 'It is contended, however, by the appellant, that a corporation debtor does not stand on the same footing as an individual debtor; that, whilst the latter has supreme dominion over his own property, a corporation is a mere trustee, holding its property for the benefit of its stockholders and creditors; and that if it fail to pursue its rights against third persons, whether arising out of fraud or otherwise, it is a breach of trust, and creditors may come into equity to compel an enforcement of the corporate duty. This, as we understand, is the substance of the position taken.

"'We do not concur in this view. It is at war with the notions which we derive from the English law with regard to the nature of corporate bodies. A corporation is a distinct entity. Its affairs are necessarily managed by officers and agents, it is true; but, in law, it is as distinct a being as an individual is, and is entitled to hold property, if not contrary to its charter, as absolutely as an individual can hold it. Its estate is the same, its interest is the same, its possession is the same. Its stockholders may call the officers to account, and may prevent any malversation of funds or fraudulent disposal of property on their part. But that is done in the exercise of their corporate rights, not adverse to the corporate interests, but coincident with them.

"'When a corporation becomes insolvent, it is so far civilly dead that its property may be administered as a trust fund for the benefit of its stockholders and creditors. A court of equity, at the instance of the proper parties, will then make those funds trust funds, which, in other circumstances, are as much the absolute property of the corporation as any man's property is his.'

"With reference to the suggestion in this last paragraph, it may be observed that the court does not attempt to determine who are proper parties to maintain a suit for the administration of the assets of an insolvent corporation. All that it decides is that, when a court of equity does take into its possession the assets of an insolvent corporation, it will administer them, on the theory that they, in equity, belong to the creditors and stockholders, rather than to the corporation itself. In other words,—and that is the idea which underlies all these expressions in reference to 'trust' in connection with the property of a corporation,—the corporation is an entity, distinct from its stockholders as from its cred-

itors. Solvent, it holds its property as any individual holds his, free from the touch of a creditor who has acquired no lien; free, also, from the touch of a stockholder who, though equitably interested in, has no legal right to, the property. Becoming insolvent, the equitable interest of the stockholders in the property, together with their conditional liability to the creditors, place the property in a condition of trust, first for the creditors, and then for the stockholders. Whatever of trust there is arises from the peculiar and diverse equitable rights of the stockholders as against the corporation in its property, and their conditional liability to its creditors. *It is rather a trust in the administration of the assets after possession by a court of equity, than a trust attaching to the property, as such, for the direct benefit of either creditor or stockholder.*" (Italics our own.)

After reviewing a number of cases decided by the Supreme Court, the opinion in the Hollins Case, supra, continues:

"These cases negative the idea of any direct trust or lien attaching to the property of a corporation in favor of its creditors, and at the same time are entirely consistent with those cases in which the assets of a corporation are spoken of as a 'trust fund,' using the term in the sense that we have said it was used. * * *

"A party may deal with a corporation, in respect to its property, in the same manner as with an individual owner, and with no greater danger of being held to have received into his possession property burdened with a trust or lien. The officers of a corporation act in a fiduciary capacity in respect to its property in their hands, and may be called to an account for fraud, or sometimes even mere mismanagement, in respect thereto; *but, as between itself and its creditors, the corporation is simply a debtor, and does not hold its property in trust, or subject to a lien in their favor, in any other sense than does an individual debtor.* That is certainly the general rule, and, if there be any exceptions thereto, they are not presented by any of the facts in this case. Neither the insolvency of the corporation, nor the execution of an illegal trust deed, nor the failure to collect in full all stock subscriptions, nor all together, gave to these simple contract creditors any lien upon the property of the corporation, nor charged any direct trust thereon." (Italics our own.)

In the absence of any decision or law of the state of Oregon declaring void such a conveyance as here involved, we think the rule announced by the Supreme Court of the United States should be followed.

Accordingly, the judgment is affirmed.